# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.                                             Cr. No. 99-110 JP

**LAMAR JOHNSON and
JOHN MCDONALD LAWRENCE,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

On April 2, 1999, Defendant Lamar Johnson filed a motion to suppress evidence that was found when New Mexico police detained him and searched the car he was driving on January 14, 1999. Co-Defendant John Lawrence, who was a passenger in the car, joined in the motion to suppress. On May 5, 1999, an evidentiary hearing on the motion was held at which two witnesses testified. On July 23, 1999, Defendant John Lawrence filed his supplemental motion to suppress, in which Co-Defendant Lamar Johnson joins. Defendants argue that both the initial stop of their car and their prolonged detention violated their Fourth Amendment rights.

After a careful review of the evidence, the law, and the briefs submitted by all of the parties in this case, I conclude that the motion to suppress and the supplemental motion to suppress should be denied.

**FACTS**

Shortly after 2:00 p.m. on January 14, 1999, Corporal Derrick Shaw of the Tucumcari, New Mexico Police Department had just come on duty. The dispatcher informed Corporal Shaw that New Mexico State Police had stopped two vehicles about twenty miles outside of Tucumcari for suspected narcotics trafficking, and that a third car—a Mitsubishi with Michigan license plate PUF217— was possibly traveling with the other two vehicles. However, the third car had not been pulled over. Corporal Shaw hastily drove in his patrol car to the western outskirts of Tucumcari and waited for the third car, watching the traffic heading east into town. In a few moments he observed a black Mitsubishi four-door sedan with a Michigan license plate pass by traveling eastward. The make of the car and its Michigan license plate caught Corporal Shaw's attention, so he decided to pursue the Mitsubishi. Corporal Shaw caught up with the black Mitsubishi about two miles later.

Corporal Shaw noticed that the Mitsubishi displayed Michigan license plate PRG263, which was different than the license plate number the dispatcher had given Corporal Shaw. Corporal Shaw asked the dispatcher to run a Motor Vehicle Department check on the license plate. The dispatcher then reported to Corporal Shaw that the license plate was registered to a 1995 Mitsubishi belonging to James Washington, Jr., but that it was not a valid license plate and had been reported as "replaced." The expiration date for the license plate was March of 1999.

Corporal Shaw then turned on his emergency lights and pulled over the black Mitsubishi at 2:33 p.m. He then got out of his police car and approached the driver's side of the Mitsubishi. Defendant Lamar Johnson was driving, and Defendant John Lawrence was seated in the right front passenger seat. Corporal Shaw asked Defendant Johnson for his driver's license, proof of

insurance, and registration. Defendant Johnson handed Corporal Shaw a Michigan Identification Card, not a driver's license, with Johnson's name, photograph, and address located in Detroit, Michigan. Defendant Johnson also gave Corporal Shaw valid registration and insurance certificates showing that the car belonged to James Washington, Jr. of Warren, Michigan. Corporal Shaw asked Defendant Johnson to get out of the car, and Defendant Johnson complied. Corporal Shaw and Defendant Johnson then stepped behind the Mitsubishi, away from the traffic, and Corporal Shaw asked Defendant Johnson the identity of the passenger of the car. Defendant Johnson replied, "That's Lawrence."

Corporal Shaw went back to the Mitsubishi and asked Defendant Lawrence for his name and identification. As Defendant Lawrence retrieved his identification, Corporal Shaw asked him where the pair was going. Defendant Lawrence said they were going to Detroit. Corporal Shaw then inquired, "What takes you up there?" to which Defendant Lawrence responded, "I am just helping him drive." Corporal Shaw questioned Defendant Lawrence regarding how he knew Defendant Johnson, and Defendant Lawrence stated that Defendant Johnson was his cousin. Defendant Lawrence handed Corporal Shaw a California driver's license and told Shaw that he lived in California. Corporal Shaw asked how long Defendant Johnson had been in California, and Defendant Lawrence responded that it had been about two weeks.

At this point, Corporal Shaw returned to Defendant Johnson, who was still standing off the road behind the Mitsubishi near Shaw's patrol car. Corporal Shaw asked Defendant Johnson to sit with him in the front of his patrol car while he asked the dispatcher to check on the status of both Defendants' drivers' licenses. While he waited for the response from dispatch, Corporal Shaw explained to Defendant Johnson that he had been stopped for having an invalid license

plate. Corporal Shaw also asked Defendant Johnson, "Where are you all headed to?" to which Defendant Johnson replied "Detroit." In response to further questions, Defendant Johnson informed Corporal Shaw that he lived in Detroit and that Defendant Lawrence was "just a friend" whom he had met playing basketball in Detroit and had known for six or seven years. Then the dispatcher radioed Corporal Shaw and reported that Defendant Johnson did not have a valid driver's license. Corporal Shaw warned Defendant Johnson not to do any further driving and handed him his identification card, Defendant Lawrence's driver's license, and the certificates of registration and insurance. At this point, the time was 2:38 p.m.

Defendant Johnson moved as though he was going to get out of Corporal Shaw's police car. However, Corporal Shaw asked Defendant Johnson, "Would you mind waiting just a minute?" to which Defendant Johnson replied, "No." Corporal Shaw then told Defendant Johnson that he wanted to ask Defendant Johnson a few more questions. Defendant Johnson stayed in the car and did not object to answering further questions. In response to Corporal Shaw's queries, Defendant Johnson stated that he and Defendant Lawrence were coming from Pasadena and that Johnson had been there for about three days staying with his aunt. Defendant Johnson told Corporal Shaw that the purpose of the trip was to go hiking and to visit his aunt, who was his only relative in the area. However, Defendant Johnson also stated that he did not remember his aunt's name, that he didn't think she was married but that she had a boyfriend, and that he thought she had two kids. Defendant Johnson told Corporal Shaw that he was traveling with people who were driving a Grand Am and a Bronco (the two cars stopped by State Police), that he had never been arrested, and that he lived in Detroit, Michigan. Defendant Johnson stated that Defendant Lawrence had a brother named Shannon who lived in Detroit, and that Lawrence

4

had ridden with him in the Mitsubishi from Michigan to California. Corporal Shaw then told Defendant Johnson that he was going to go talk to Defendant Lawrence for a moment, and that Defendant Johnson could continue to sit in the police car or get out if he wanted to. Defendant Johnson got out of the car, and handed the documents back to Corporal Shaw. Defendant Johnson asked Corporal Shaw to give the documents to Defendant Lawrence so that he could put them back into the glove compartment. Corporal Shaw agreed, walked to the passenger side of the Mitsubishi where Defendant Lawrence was still seated, and handed him the papers.

Corporal Shaw asked Defendant Lawrence if he would mind answering a few questions, and Defendant Lawrence agreed. Defendant Lawrence told Corporal Shaw that they were coming from Pasadena, where Lawrence lived, and that Defendant Johnson had been in California for a couple of weeks. Defendant Lawrence said that Defendant Johnson had stayed in a Motel 6, but he had also stayed with a relative for a couple of days, and that the purpose of Defendant Johnson's trip to California had been to attend a family reunion in Los Angeles. Defendant Lawrence also restated that he and Defendant Johnson were cousins and said that they were traveling with some other relatives. However, Defendant Lawrence could remember the full name of only one such other relative and only the first name of a second relative; he could not remember the names of any of the others. At this point, Defendant Lawrence asked Corporal Shaw what the problem was, and Corporal Shaw informed him that the license plate was invalid and that Defendant Johnson had been driving without a valid driver's license. Corporal Shaw asked Defendant Lawrence if he had any other family in Detroit, and Lawrence responded "My cousins." Defendant Lawrence denied having any brothers or sisters in Detroit and denied having ridden in the Mitsubishi from Michigan to California. Corporal Shaw asked Defendant Lawrence

5

who owned the car, and Lawrence responded, "I can't remember his name. It's my uncle." Finally, Defendant Lawrence said that the car was owned by Keith Washington.

Corporal Shaw then returned to Defendant Johnson, who was leaning up against the right front fender of Corporal Shaw's patrol car. Corporal Shaw asked Defendant Johnson if he had any narcotics or other drugs in the car. When Defendant Johnson denied it, Corporal Shaw asked Defendant Johnson if he could search the Mitsubishi. Defendant Johnson responded, "There is nothing in it." Corporal Shaw then stated, "I want to search your car for narcotics" and Defendant Johnson said, "Okay." Corporal Shaw then handed Defendant Johnson a Tucumcari Police Department consent to search form, which Defendant Johnson filled out in his own handwriting. After Defendant Johnson filled out the consent form (Government's Exh. 6), he read each paragraph out loud to Corporal Shaw, stated that he understood it, and initialed it in the margin. While Defendant Johnson was doing that, Officer Eric Kitt of the Tucumcari Police Department arrived at 3:06 p.m.

Corporal Shaw and Officer Kitt began searching the Mitsubishi. They found several indicia of the presence of a hidden compartment, such as plastic clips, loose screws, an unusually hard seat back on the back seat, and a modified backseat armrest. Corporal Shaw and Officer Kitt eventually found a hidden compartment under the trunk of the car. After their attempts to open the compartment failed, Corporal Shaw brought out his canine, Eno. However, Eno was sick, did not pay attention to the car, and did not alert. Corporal Shaw then examined the carpeting in the trunk more carefully and found further signs that the carpet in the trunk had been replaced. Then, at 4:09 p.m. State Police Officer Nathan Wallace arrived with a second canine, which alerted to the presence of narcotics in the car. Finally, because they had been unable to open the

compartment, Corporal Shaw drilled a hole in the compartment and the officers then were able to see several pink packages inside. Eventually, the Defendants and the car were taken to another location, where police opened the Mitsubishi's hidden compartment, revealing approximately 17.35 pounds of cocaine.

## ANALYSIS

**1.    Standing**

As the Supreme Court made clear in Rakas v. Illinois, 439 U.S. 128, 148-49 (1978), a passenger who asserts neither a possessory nor a property interest in a vehicle has no legitimate expectation of privacy in the vehicle worthy of Fourth Amendment protection. Although Defendants had possession of the Mitsubishi at the time of the search, "[m]ere physical possession or control of property is not sufficient to establish standing to object to a search of the property." United States v. Conway, 73 F.3d 975, 979 (10th Cir. 1995). Therefore, mere possession of a car and its keys are not sufficient to confer standing. United States v. Erwin, 875 F.2d 268, 271 (10th Cir. 1989).

In this case, Defendants put forward almost no evidence of their standing to challenge the search of the Mitsubishi. Neither Defendant was able to prove ownership or lawful possession of the car. Although Corporal Shaw testified that Defendant Lawrence said that the car had been loaned to him by his uncle Keith Washington, that name did not match the name on the registration and proof of insurance. The only other evidence on this issue is the proffer made by counsel for Defendant Lamar Johnson that on January 14, 1999, his client believed that Defendant John Lawrence's uncle owned the Mitsubishi. Even assuming the truthfulness of this proffer,

7

which is not uncontested[1], the Defendants have offered no evidence showing that James Washington gave Defendant Lawrence permission to use the car or that Washington gave Defendant Lawrence the authority to permit others drive it. This is insufficient for either Defendant to demonstrate standing under the Fourth Amendment. See United States v. Martinez, 983 F.2d 968, 973-74 (10th Cir. 1992) (holding that driver and passenger who believed that they had lawful possession of car but were unable to present evidence that car had been given to them by someone with lawful authority to do so failed to establish standing to challenge search of the car); United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990) (finding that defendant did not have a reasonable expectation of privacy in the vehicle he was driving where defendant testified that he had borrowed the vehicle from someone he knew was not the owner and failed to present evidence that the registered owner had given lawful possession of the truck to the person who loaned it to him). Consequently, I conclude that Defendants have failed to show that they have standing to assert a valid possessory or property interest in the Mitsubishi which the Fourth Amendment will protect.[2]

The Defendants do, however, have standing to challenge the initial stop of the car and the prolonged detention. As the Tenth Circuit stated in United States v. Shareef:

---

[1] At the May 5, 1999 hearing, counsel for the United States proffered the testimony of Agent Manns, who has contacted James Washington. The substance of the proffer was that James Washington had denied knowing either Defendant.

[2] On July 12, 1999, I stated this ruling on the record at Defendant Lamar Johnson's aborted plea hearing. However, the basis for the ruling is stated more fully in this Memorandum Opinion and Order.

> We distinguish passenger standing to directly challenge a vehicle search from passenger standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest. If the physical evidence found in the vehicle was the fruit of the defendants' unlawful detention, it must be suppressed. This requires a two part inquiry: first, whether the defendants were unlawfully detained, and second, whether the discovered evidence was the fruit of that unlawful detention. Only if both of those questions are answered in the affirmative will the physical evidence found in the vehicles be suppressed.

100 F.3d 1491, 1500 (10th Cir. 1996) (internal citations and quotations omitted). See also United States v. Gama-Bastidas, 142 F.3d 1233, 1238 (10th Cir. 1998) (stating that defendant lacked standing to challenge warrantless searches of vehicle in which he was passenger at time of stop; however, defendant did have standing to challenge the initial stop and detention). Consequently, I will analyze the legality of the initial stop and the subsequent detention of the Defendants.[3]

**2.    Initial Stop**

In United States v. Hensley, the Supreme Court stated that an investigative stop by police officers in reliance on a "wanted flyer" issued by another police department is reasonable under the Fourth Amendment if the flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion the wanted person has committed an offense. 469 U.S. 221, 232-33 (1985)(internal citations omitted). There is no evidence in the record in this case as to whether or not Officer Chavez had reasonable suspicion to stop the other two cars with Michigan license plates or to request that Corporal Shaw stop Defendants' Mitsubishi. Officer Shaw was initially attracted to the black Mitsubishi because of suspicions passed on from Officer Chavez.

---

[3] Because I conclude that both the initial stop and the prolonged detention were lawful, I do not reach the second prong of this test, that is, whether or not the evidence the Defendants seek to suppress was found as a result of their detention.

Defendants argue that because Officer Chavez did not have reasonable suspicion to stop Defendants' car, neither did Corporal Shaw.

However, Defendants overlook the well-established rule that a traffic stop "is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc). Furthermore, where a police officer has probable cause to believe that a traffic violation has occurred, he may lawfully stop an automobile despite any impermissible subjective motivations he may have. See Whren v. United States, 517 U.S. 806, 812-15 (1996).

In this case, Corporal Shaw asked his dispatcher to obtain information on the Mitsubishi's Michigan license plate PRG263 after he realized that it was a different license plate number than that which he had originally been given. The dispatcher informed Corporal Shaw that the Michigan license plate number PRG263 was registered to a 1995 Mitsubishi belonging to James Washington, Jr., but that it was not a valid license plate and had been reported as "replaced." At that point, Corporal Shaw had a reasonable suspicion to believe that a traffic or equipment violation had occurred or was occurring, and this case was no longer governed by the rationale in Hensley. Instead, Corporal Shaw had reasonable suspicion to stop the Defendants for a traffic violation that was independent and separate from the initial bulletin sent out by Officer Chavez. Consequently, the initial stop of the Defendants was proper.

### 3. Prolonged Detention

Defendants argue that their detention was impermissibly long. Defendants insist that

Corporal Shaw should have released them five minutes after the stop began, immediately after he had already examined Defendants' driver's licenses and the car's registration, run a computer check, and given Defendant Johnson a verbal warning. During the remainder of the detention after 2:38 p.m., assert the Defendants, Corporal Shaw's questioning exceeded the purpose and scope of the traffic stop.

The permissible scope and length of a traffic stop has been extensively analyzed by the Tenth Circuit Court of Appeals. An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. United States v. Gonzales-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994). When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning. United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988) (citations omitted), overruled on other grounds, United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995) (en banc). The investigative detention usually must "last no longer than is necessary to effectuate the purpose of the stop," and "[t]he scope of the detention must be carefully tailored to its underlying justification." Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325 (1983).

Further questioning is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993). Second, further questioning is permissible if the initial detention has become a consensual encounter. United States v. DeWitt, 946 F.2d 1497, 1502 (10th Cir. 1991), cert. denied sub nom. Rison v. United States, 502 U.S. 1118, 112 S.Ct. 1233

11

(1992). Accord United States v. Hunnicut, 135 F.3d 1345, 1349 (10th Cir. 1998). In this case, both factors are satisfied.

*(a) Reasonable suspicion*

A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity. Among the factors that have justified further questioning are having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination. See United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995); Gonzalez-Lerma, 14 F.3d at 1483-84; United States v. Peña, 920 F.2d 1509, 1514 (10th Cir. 1990), cert. denied, 501 U.S. 1207, 111 S.Ct. 2802 (1991). Also among the factors justifying reasonable suspicion are driving with a suspended license, see Jones, 44 F.3d at 872, and reluctance to stop, see id.; United States v. Villa-Chaparro,115 F.3d 797, 802 (10th Cir. 1997); United States v. Walraven, 892 F.2d 972, 975 (10th Cir. 1989). In particular, the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many Tenth Circuit cases upholding further questioning. See United States v. Horn, 970 F.2d 728, 732 (10th Cir. 1992); United States v. Turner, 928 F.2d 956, 959 (10th Cir. 1991); United States v. Arango, 912 F.2d 441, 447 (10th Cir. 1990); see also United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994) (The "defining characteristic of our traffic stop jurisprudence is the defendant's lack of ... some ... indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen.").

In this case, Corporal Shaw's traffic stop of Defendants concluded five minutes after it had begun, when Corporal Shaw completed the computer check, gave Defendant Johnson a warning, and returned Defendant Johnson's documentation to him. However, by that point

12

Corporal Shaw had reasonable suspicion to believe that the Defendants may have been engaged in criminal activity, and was therefore justified in asking the Defendants further questions. Defendant Johnson was driving without a valid driver's license, and neither Defendant was able to produce proof of his ownership of the Mitsubishi or proof of authority to operate the vehicle. Defendant Lawrence had struggled to remember the name of the uncle who had loaned him the car, and the name that he finally gave Corporal Shaw did not match the name on the registration. Furthermore, the Defendants had given Corporal Shaw conflicting information regarding their relationship to each other; although Defendant Lawrence said they were cousins, Defendant Johnson said they were friends who had met playing basketball. As Corporal Shaw testified at the hearing, based on his experience and training such discrepancies in the information given by Defendants are consistent with the presence of criminal activity.

Consequently, Corporal Shaw had reasonable suspicion to ask the Defendants more questions after he returned their documentation to them. That reasonable suspicion continued to increase during the subsequent conversations he had with the Defendants, as they gave him additional conflicting information about the length of Defendant Johnson's stay in California, the purpose for his trip there, and his mode of travel from Michigan to California. Defendant Johnson said he had stayed with his aunt, but could not remember his aunt's name. The Defendants also made inconsistent statements about whether Defendant Lawrence had a brother who lived in Detroit. Therefore, there was reasonable suspicion to detain the Defendants for continued questioning until evidence of the hidden compartment was found in the Mitsubishi at

13

approximately 3:18 p.m.[4]

*(b)     Voluntariness*

Further questioning of the Defendants after the traffic stop was completed at 2:38 p.m. was permissible because their encounter with Corporal Shaw had become consensual. After completing his computer check, Corporal Shaw handed all the documents to Defendant Johnson[5] and asked him if he would mind answering a few more questions. Defendant Johnson said "No," and did not get out of the patrol car. Corporal Shaw did not use a threatening tone of voice and did not display his weapon. In addition, Corporal Shaw was the only law enforcement officer present at the time. In short, there is no evidence in the record that Defendant Johnson's consent to answer more questions was involuntarily given.

The same analysis applies to Defendant Lawrence. After Corporal Shaw had finished talking with Defendant Johnson, he approached Defendant Lawrence and handed him the documents, including Lawrence's driver's license. Corporal Shaw then asked Defendant Lawrence if he would mind answering a few questions, and Lawrence agreed. Again, Corporal Shaw did not use a threatening tone of voice, did not display his weapon, and was the only law enforcement officer present at the time. Consequently, the encounter between Corporal Shaw and Defendant Lawrence, which continued until the discovery of the hidden compartment, was consensual as well.

---

[4] Once Corporal Shaw and Officer Kitt discovered evidence of a hidden compartment in the Mitsubishi, they had probable cause to search the car, see United States v. Anderson, 114 F.3d 1059, 1066 (10th Cir. 1997), which justified further detention of the Defendants.

[5] An encounter cannot be consensual while a police officer retains a suspect's documents, such as a driver's license. United States v. McKneely, 6 F.3d 1447, 1451 (10th Cir.1993).

IT IS THEREFORE ORDERED that:

(1) Defendant Lamar Johnson's motion to suppress evidence (Doc. No. 25) is DENIED; and

(2) Defendant John Lawrence's supplemental motion to suppress (Doc. No. 43) is DENIED.

_____
**UNITED STATES DISTRICT JUDGE**